will be in Appeal No. 222922, the United States v. Monica Wright. And Ms. Davenport, nice to see you. Whenever you're ready, you may proceed. Good morning, Your Honors. May it please the Court, my name is Valerie Davenport on behalf of Defendant Appellant Monica Wright. Your Honors, we are here today because the trial court when presented on the record in open court with Defense Counsel's conflict of interest failed to protect my client's bedrock Sixth Amendment right to conflict-free counsel and because the evidence presented at trial was insufficient to support Ms. Wright's conviction. The trial court was apprised by the government of the possibility of a conflict and Defense Counsel Mr. Garfinkel's on-the-record response confirmed that such a conflict had come to fruition. Mr. Garfinkel said, quote, if in fact he's going to get up on that stand and say that during our conversation or conversations that I made that insinuation, then asked him to change his testimony, I'm not calling him, end quote. Just the day before an opening statement, Mr. Garfinkel had made it clear to the jury that he would be relying on Joey De Herrera's exculpatory testimony for the defense's case. He said, quote, you'll hear De Herrera say he never saw her with large amounts of cash or large amounts of methamphetamine, that they went there to get high because it was a safe place to get high. Please listen carefully to Joey De Herrera's testimony, end quote. That same day, Cindy Evans got up on the stand and said that Joey De Herrera had been there for multiple of these kilo or close to kilo-sized transactions. Then the first thing the next morning, the government raised the possibility of a conflict. They said that in a prep session the night before with Mr. De Herrera, that he had informed them that in a previous meeting with just Mr. Garfinkel, that he felt Mr. Garfinkel had insinuated that he had lied to the grand jury and that Mr. Garfinkel would like him to change his testimony at trial. They were choosing not to call Mr. De Herrera, and they worried that this accusation would cause Mr. Garfinkel to not call Mr. De Herrera, despite there being two pieces of exculpatory evidence that Mr. De Herrera was offering, one that Mr. Garfinkel had already promised to the jury, and a second additional piece of exculpatory information that had just been disclosed to the defense that morning. Why are you, let me press you a little bit on whether there's even a conflict of interest here. Yes, Your Honor. It's hard for me to see that. Your Honor, it's when, I think it's important to look at both Mr. Garfinkel's words and the case in context. Mr. Garfinkel, he is obviously upset by this accusation, and without consulting his client, he summarily chooses not to call Mr. De Herrera, and he says that it's because Mr. De Herrera might get up on the stand and say this about him. And if you look at this in the context of the case, this is a testimonial-based case. There are, the main evidence is these two alleged co-conspirators who say that my client, Ms. Wright, was selling them kilo-sized amounts of methamphetamine. See, I read it a little bit differently. I read that, you accurately quoted the transcript. There's no question about that. But it seems to me to be, for Mr. Garfinkel to call Mr. De Herrera is really, really risky. And he said in the colloquy right before the part you quoted, I don't have any idea what the guy's going to say when he gets on the witness stand. And most criminal defendants will not, or defense counsel, are not going to put their clients in a situation like that. How does Mr. Garfinkel have any clue what Mr. De Herrera is going to say on the witness stand? And Mr. De Herrera knew your client, had a relationship with your client, and based upon previous statements that he made and information he supplied to the government, had every reason to believe he knew your client was in the drug business. So that's a dangerous proposition to affirmatively call that witness as a defense witness. Your Honor, it's important to note that the government does not dispute what Mr. De Herrera is going to say to the jury. That he will say that he never saw these individuals exchange large amounts of methamphetamine. Ever? Or on a particular occasion in connection with the so-called fourth visit? As a general statement. The fourth visit is a different piece of exculpatory evidence. It's that that fourth visit was about the romantic conflict that's presented to the jury. Not that it wasn't about a drug transaction. So the government does not dispute that Mr. De Herrera is going to say that he did not see large transactions between these people. Ms. Davenport, as I read your brief, it's a fine brief, one question kept coming up to me. What should the district judge have done differently? Tell me what, if you were the district judge, what would you have done that this district judge did not do? Your Honor, that's an excellent question. And there are, we are not saying that the, we would say that the district court needed to either disqualify Mr. Garfinkel, which we don't ever get to that point where that's necessary in this case, or receive a valid waiver from Ms. Wright. So ask her if she would like that she, that she inform her that she does have the right to conflict-free counsel and explain the situation, giving her, introducing an alternative for her that she could have conflict-free counsel, and then ask if she can get a confirmation from Ms. Wright, whether she's waiving that right. So you're, in essence, you don't think the district court went far enough, am I right? That she said, well, I first want to find out if there is a conflict, and she decided to let them talk it through. She didn't say, you would have had her say, as a matter of law, there's a conflict here. If Ms. Defendant, these are your rights, what do you want to do? We are positing that there is a conflict based on the record, and the judge had that information right then, and therefore, did need to receive a waiver from Ms. Wright. I see. And you don't think the district court sitting there at trial did have a certain amount of flexibility and discretion in how it goes about probing the matter like this? The court definitely has flexibility, for instance. My colleague, Judge Scudder, just pointed out, in this case, this guy was not a good witness for anybody. Didn't the district judge just say, look, I think without getting into the question of disqualification, if these people talk this thing through, she was involved to some degree in the colloquy, I can be satisfied that things are all right. Your Honor, there is not a waiver colloquy on the record, and therefore, because there is a conflict, the trial court allowed that conflict to persist. There are definitely different actions that we could suggest to the trial court, for example. What you mean by that, I think, is there's not a waiver colloquy to the extent that there is an express statement to Ms. Wright, I need you to understand something, Ms. Wright. What's being alleged here is that your lawyer, Hal Garfinkel, has a conflict of interest. Do you understand that that's what's being alleged? You understand that under the Sixth Amendment of the U.S. Constitution, you have a right to conflict-free counsel. That's what's missing from the colloquy, correct? Yes. Yes, Your Honor, and in addition. Okay, but what did happen here is Ms. Wright sat in open court through this whole exchange when it happened, right? I mean, the transcript's pretty clear that you read from. She was present on the second day of trial. She heard how it surfaced. The government's the one that raised it. I don't remember who the district court judge was, whoever it was, Judge Darrow maybe? Yes, Your Honor. Judge Darrow, you know, she heard it. She then reacted to it. She had this colloquy that you say was inadequate, but Ms. Wright was present for all that. But she has never . . . So she heard the context. She did hear some of the context of the conflict, but she has never informed that she has a right to a lawyer without a conflict. That alternative is never presented to her, and that is the core of a waiver. That's what this court has said, and in U.S. v. Ellison, U.S. v. Bell, U.S. v. Roth, that's a core tenet to Seventh Circuit waivers, is informing the defendant . . . In your view. It's scripted. There's not a lot of flexibility in it. You have to use the magic words, or something awfully close to them, conflict-free counsel, Sixth Amendment, and if those words aren't in the transcript, there's a problem. There is a problem not informing her. We don't think it goes to magic words, but that must be communicated to Ms. Wright, and in substance, that's also not communicated here, because there's no alternative given, and they don't discuss the right at all. With Judge Scudder's kind permission, I wonder if we could give counsel a few minutes to talk about sufficiency. Yeah, absolutely. I have some . . . I would really like to hear what she has to say. Yes, Your Honors. Ms. Wright's conviction should be also vacated because the government has failed to produce sufficient evidence to show that Ms. Wright entered into a conspiracy to distribute methamphetamine. I would note that drug conspiracies hold a unique place in Seventh Circuit precedent, as you know, where if there is an equal plausibility that there was a buyer-seller relationship versus a drug conspiracy, that that is insufficient evidence, and so even looking at the evidence in the light most favorable to the government here, the evidence showed at most nothing more than a buyer-seller relationship. Here's my question, if I may. Yes, Your Honor. I think you were dead right in raising this, and I think it's a very close question on whether you're also right that we have become somewhat more careful in scrutinizing conspiracy allegations, but . . . and I don't know what I would have done if I were a juror on this, but here the only question is legal sufficiency. Yes, Your Honor. Why isn't there legal sufficiency to say that they were in this together? Yes, Your Honor, and I would note that I would like to reserve some time for rebuttal if that is all right, but can I still answer your question? Yeah, please answer. We'll give you a minute for a rebuttal. Okay, thank you. We believe that Polgar is instructive here, U.S.P. Polgar, from 2015, that in that case the defendant sold large amounts, large quantities of cocaine to the alleged co-conspirator over a course of a decade, that there was evidence of multiple instances of fronting, that there was an acceptance of return of lousy cocaine, there was that policy, and that there was this long-term decade-long friendship, and the court found that that was not enough to push it over the edge from just a buyer-seller to a conspiracy, and there is even less evidence of them being in it together, as you would say, in the record here, and therefore we would ask that this court vacate her conviction for both of those reasons. Thank you. Okay, Ms. Davenport, we'll give you a minute for rebuttal. Ms. Boyle, nice to see you. Nice to see you, Your Honor. Good morning, Your Honors. May it please the court, counsel, my name is Catherine Boyle on behalf of the United States. Your Honors, I think you've really hit on the salient issue here, which is, is there an actual or serious potential conflict at all, and what was the district court's obligation, and what kind of flexibility does the district court have, Your Honor, to explore this type of issue? In this case, it's clear the district court fulfilled its responsibilities. The government raised the potential conflict issue when it became aware of it on the second day of trial, and the district court then had an on-the-record discussion with Mr. Garfinkel for which Ms. Wright was present. Going into this discussion, the district court knew a few things. It knew that Mr. de Herrera had been a planned government witness. It knew that Mr. Garfinkel planned to speak with him on cross-examination. The fact that Mr. de Herrera's testimony was going to support the government's case was evidenced by the government Santiago proffer, as well as certain statements made by the government in opening. So it made sense here, and that was actually also indicated by the fact that Mr. de Herrera's allegation that defense counsel wanted him to change some of his grand jury testimony further indicated that there might be something damaging he would say towards the defense. So as the district court goes into this, the district court knows all of these things. It has a discussion with Mr. Garfinkel, and Mr. Garfinkel fairly says that given these allegations, he views Mr. de Herrera as an extremely risky witness, and frankly, that's the conclusion that the government came to as well. When you have a witness where you are not sure what they are going to say, it is a risky witness for any party to bring up in a criminal trial, and it's a fair thing for defense counsel to consider that and for the government to reach the same conclusion that calling Mr. de Herrera to the stand in light of this issue is just too risky for either of them. How detailed was the Santiago proffer with respect to de Herrera? It grouped all the witnesses together, so it wasn't particularly detailed with respect to him alone, but it did say that it planned to call Mr. de Herrera and other witnesses for several purposes, including, and then it lists several points, for evidence of agreements between Ms. Wright and her co-conspirators to distribute methamphetamine, including the plans to distribute methamphetamine, the actual facilitation of those distributions, arrangements for future distributions, and assistance in continuing the distribution of methamphetamine. But based also on the government's opening and Mr. Garfinkel's opening, it's pretty clear that the government was planning to call partly to show that Mr. de Herrera was the point person who had introduced these Quad City meth dealers to Ms. Wright in Colorado and to sort of establish these various connections. Yeah, right. He's the one that pointed out that there's this person in Colorado Springs that's selling kilo quantities of meth. Exactly, Your Honor. Mr. Pfister and Ms. Evans had mutual friends in the Quad Cities area who said, we know somebody in Colorado who can introduce you to a steady supply of methamphetamine. I mean, it seems mighty dangerous for a defense lawyer to put that witness on the stand, not knowing what the person's going to say. I think that's exactly right. One thing that I also think needs to be brought out here is, and this goes into my next point about the court's colloquy with Ms. Wright, really nobody is better positioned to know what Mr. de Herrera might truthfully say on the stand that could be damaging than Ms. Wright herself. She's admitted her connections to the people in this conspiracy to an extent, if not to the full extent of the drug dealing. So she knows that he's going to get up there. She knows exactly what their interactions were. She has a private, off-the-record conversation with defense counsel. Defense counsel, of course, at this point, pursuant to Jenks, and he had had a phone call with Mr. de Herrera, presumably has the grand jury testimony. But Ms. Wright knows what happened. And she knows exactly, as she has this discussion with defense counsel, what Mr. de Herrera might get up and say. So, in short, this court has held it reasonable for the district court to rely on defense counsel's assessment regarding the potential for a conflict, and we think the district court did that very reasonably here. We think Mr. Garfinkel was quite right in viewing this as a risky witness, and he had not planned to call him in the defense's case in chief anyways. He had planned to cross-examine him. That's an effort that defense attorneys frequently do. You try to make lemonade out of lemons. There's a witness who's not great for you that the government calls, but you get up on cross-examination, and you try to draw out the best points you can from that witness. So we think the district court potentially could have stopped there, but properly went, perhaps appropriately, went even further in safeguarding Ms. Wright's choice to conflict-free counsel. It did that, even though the court said on the record, you know, I'm not sure a waiver of conflict would be necessary. I'm not sure there is a conflict. And it asks Ms. Wright, it asks Mr. Garfinkel if he's had a conversation with Ms. Wright. He says that he hasn't. So she says, I'm going to take a brief recess and give you time to do that. Before we go back into the on-court discussion, I also want to note that as Ms. Wright went into this discussion, as Judge Scudder, you noted, Ms. Wright was present for the entire prior discussion with defense counsel on the exact nature of the conflict. And the court also knows that Ms. Wright has gone through four attorneys at this point. She's previously replaced a private attorney. So these are two factors the court has in terms of her knowledge of the process and whether she is able to switch attorneys in her case. So they come back from a brief recess, and the district court then holds a colloquy with Ms. Wright's record to be sure that she really understands what's going on here. And even though she was present before, the district court reiterates the exact nature of the conflict. It goes through to make sure she understands it. It attempts to make sure that her interests and defense counsel's interests align in not calling Mr. de Orellana and then that nobody has forced her to sort of reach this conclusion. So the district court was quite careful here. And if you look at this court's case law, there's several cases where the courts say when the district court has engaged in this sort of adequate exploration of the possibility of conflict, that that's enough. So we think this case really should be decided on that alone. This is a case where the district court did exactly what we would want it to do. The district court was careful. The court attempted to make sure Ms. Wright understood everything that was going on. Ms. Wright was aware of her right to replace her counsel. Ms. Wright, better than anybody in the room, knew what Mr. de Orellana might say. And Ms. Wright then made an informed decision after discussion with counsel, after speaking with the district court, that their interests were aligned and that she would continue to proceed with the same. Can I ask you one other fact question? Sure, of course. On page 44 of your brief. Yes. You got it there? You got the red brief? All right. On page 44 of the brief, about halfway down the page, you make a statement. The reason I'm, and this is relevant to some of the points you're making, I think. You say, but given that De Herrera's grand jury testimony favored the government's narrative in certain respects, Garfinkel and Wright, et cetera, they agreed not to call him. That grand jury testimony produced under the Jenks Act? And what's the substance of it? Your Honor, that's not in the record. I have not reviewed the grand jury's testimony specifically, but I did ask the district court AOSA on the case if the grand jury testimony was produced to Mr. Garfinkel, and she said yes. Okay. So my inference from that, I know it's not my inference from that, is that the grand he planned to testify to, especially regarding the relationship between Evans, the relationship that Evans had, or the alleged romantic relationship, and what happened on this fourth trip. Is that a fair inference? Your Honor. In other words, the reason the government didn't call De Herrera is because De Herrera's story was shifting. Your Honor, I'm reluctant to say too definitively, because I haven't read the transcript of the testimony, is that based on, it sounds to me like there was potentially exculpatory information the government had turned over from the grand jury testimony, I believe, about the fourth visit to Colorado and the exchange of user amounts. Based on that, the inference I would draw from this situation is that the government was likely going to call Mr. De Herrera to sort of explain the relationships and how this got started, but it potentially expected him to say a couple of things that might be unfavorable to it in terms of amounts. The only reason I'm asking, it's not every day you see a case where the government opens saying, we're going to call a witness, and then in a two-day trial, they choose not to call the witness. So something had to have happened. That's what I'm trying to figure out. What happened? Your Honor, as you noted in the context of defense counsel, when you see, you have Mr. De Herrera making allegations about what was said between him and Mr. Garfinkel, I think he was probably already one of those witnesses that the government, it might have been a close call, whether to call or not, how helpful he would be. Again, I am not speaking based on personal knowledge or having spoken to the AUSA about this, but the inference I would draw is that at a certain point, the government just decided it really wasn't worth it. Well, Pfister testified. Yes, he did. So Pfister presumably testified as to how he ended up selling kilos of methamphetamine in Colorado Springs. Yes. Okay. Yes, Your Honor. Okay, very well. Thank you, Your Honors. Thanks to you. Ms. Davenport, we'll give you, why don't we give you three minutes? Okay, we took a little bit of extra time. If you need to grab something, go right ahead. All right. Thank you, Your Honors. I'd like to return to the conflict. I think there's some pieces to go through there, just a few important points that I would like to note that when the government presented this potential conflict to the court, they said that Mr. De Herrera supports the theory that there were, and I'm quoting from the transcript, supports the theory that there were not large amounts of meth exchanged between these people and that they were smaller user quantities. So the only thing that had changed between when Mr. Garfinkel promised this exculpatory evidence and the next day is this accusation about Mr. Garfinkel. And when the government, I think you had some good points about the government's reliance on him. The defense needs this exculpatory evidence, but he is not an important witness to the government. They just present him as a connector, the introducer. So it makes sense that in light of this accusation that they would choose not to call him, that is not the same thing for the defense. When you look at the evidence in this case, the crux of the case is two alleged co-conspirators who say that my client was selling them kilo-sized amounts of methamphetamine and my client testified on the stand that she was an addict who shared user amounts with these individuals. Mr. De Herrera is the only witness who can corroborate and will corroborate that testimony. So it is absolutely essential to her case and you can see it in, that's further solidified when Mr. Pfister gets on the stand and says that Mr. De Herrera was there for kilo-sized transactions. And then when you look at Mr. Garfinkel's own closing, really contradicts any contention that this could have been beneficial or in Ms. Wright's interest not to call Mr. De Herrera. He's lamenting over and over to the jury about his choice not to call Mr. De Herrera. And the only explanation he can come up with is, quote, I don't have to call Joey. So really, that entire closing just turns a spotlight onto the gaping hole in his defense. And then one more point about the conflict is that, again, I think the timing is important. Mr. De Herrera had just learned that morning of this accusation. He is obviously upset about it and he makes the call not to call Mr. De Herrera because of this accusation and before ever consulting his client. He is making it and the only thing that has changed from when he promised the jury that this testimony would come into evidence and now is this accusation about him. And, Your Honor, because of that— Mr. Havenport? Yes, Your Honor. When Mr. Garfinkel went to discuss this with Ms. Wright, he discussed the issue of what the testimony would be, right? Your Honor, their conversation is not in the record. Right, right. Well, what do you think that conversation was about? I would imagine it was about the situation, but that entire conversation is advice from conflicted counsel, which it's already on the record that he has this conflict. And so, therefore, it does not absolve the court from needing to receive a waiver or in some other way remedy the conflict. Thank you, Your Honors. We would ask you to vacate. Okay. Thanks to you. Ms. Havenport, I see here you were court appointed as well, right, to represent Ms. Wright. You've done a very fine job. We appreciate your service to him and to the court. We appreciate the firm supporting the appointment. Ms. Boyle, thanks to you and the government as well. We'll take the appeal under advisement. Thank you, Your Honors. Thank you. Our final argument of the morning.